and I'll reserve five minutes for rebuttal and I'll watch my time. First, I'll address the impact Duarte has on our Bruin issue, as this court requested, and Duarte supports that 922A6 is unconstitutional here. And what Duarte did is clarify many things under Bruin, and it clarified the standard, and it clarified which law is abrogated, and it explains what each of the two prongs requires. So first, we now know that the review is de novo because Ms. Manney was indicted prior to Bruin being issued. And we also know that pre-Bruin analysis of a firearm statute is abrogated by Bruin because those cases did not apply the two-step framework. But most importantly, what Duarte does is it explains how to apply the two steps of Bruin. And so with the first prong, which is does the Second Amendment cover the issue here, you look to three things. The individual, which we know Manney does qualify as the people, as she's a U.S. citizen. The type of arm, here is handguns, which are the same as in Duarte, which are covered. So you agree that Duarte does not dictate the outcome. That's a decision of a three-judge panel of our court. But what you're suggesting is that we should do the review that basically the Duarte panel did and reach the merits of your Bruin argument by reviewing de novo the claim that 922 is unconstitutional. Yes, precisely. Because this is a regulation that regulates the purchase of firearms and so it falls under the Second Amendment. And so then we would need to move to the second prong, which the government did not offer any historical cases here. So we argue that they have waived the second prong in Bruin here in this case. And they certainly didn't offer cases that are distinctly similar to the how and the why of the A6 statute. And so we would ask that this court finds that 922A6 falls under Bruin, requires the two-step analysis, and that the government has waived the second prong by not providing historical analogs on appeal. And for the remainder of my time, I'll address two issues if I can. Extrinsic evidence considered by the jury and suppression of the cell phone. First, with extrinsic evidence considered by the jury, the court erred in both prongs of the two-prong test, whether the jury was exposed and second, whether it could have affected the verdict. We know that the jury was exposed to outside evidence about supposed differences between a Glock 43 and a Glock 19. The district court was wrong that the jury was not exposed to this evidence. But the district court found Juror R's testimony credible. And Juror R specifically testified that he brought up the subject of a Glock 43 versus a Glock 19, and a juror said they were different-sized guns. And that is evidence that was not in the record. At no time was the caliber or capabilities of a Glock 43 in its magazine compared to a Glock 19. So that was another error. How long did the jury come, how long did it take the jury to reach a verdict? The jury deliberated here for about one hour. And that is another issue that the district court got wrong was the timing of this extrinsic evidence. The juror testified it happened within the first five minutes of that hour, and the district court found it was only minutes before the verdict that the jury was exposed to this evidence. So that's another error in the district court's ruling. And then the second prong, whether it could have affected the verdict, which requires a reasonable possibility. And that, again, is the government's burden to disprove that. The district court used the wrong subjective standard here. It looked to whether this actually did affect Juror R's verdict. Not any of the other jurors, but Juror R's verdict. When the question is really one of objectiveness, would this have affected any reasonable juror's There was a jury note submitted on the Glock 43 and the Glock 19, and the government specifically addressed this in closing, asking, so why would she be interested in buying a magazine for a Glock 43 if she was purchasing two Glock 19s for herself? So who had the Glock 43? And so to answer that question, the jury went to outside evidence that there were differences between the Glock 43 and the parts could not be interchangeable. So because the court got most of its factors wrong, we believe this court should reverse on finding those clearly erroneous. It was wrong as to receipt, that the found that the differences were not brought up to the jury when they were, the timing that I've discussed, and the extent, the district court found the evidence was immediately dismissed by everybody. That was not Juror R's testimony. That does not occur anywhere in the record. And also you cannot consider the subjective effect on any particular juror. It's whether they were exposed. And in the context of the jury note and the government's closing, this had a reasonable possibility that it could have affected the verdict. And so we asked the court to vacate all counts and remand for a new trial. And also order suppression of the cell phone on remand, which is the government's heavy burden to prove there was voluntary consent to search that cell phone. And it must prove it's freely and voluntarily given, and that's not to be lightly inferred. Counsel, what do you point to in the record to support your contention that Manny did not consent to the search of her cell phone? Well there are seven factors to consider that this court sets forth. And the district court set forth some factors, but it stopped at the custodial factor. So the district court determined that she was not in custody, which we disagree with for reasons we have in the hearing, that she was not in custody and didn't proceed any further to the other six factors. And so those remaining unaddressed factors were undisputed here, and they are in Ms. Manny's favor. That the officers were armed. Now the guns were not drawn, but they were visibly armed. That Miranda was not given at the time outside of the firearm store is the point we're discussing where the officer sees the firearm, I'm sorry, sees the firearms and sees the cell phone. And the later Miranda was insufficient. She was not told at the time he asked for the cell phone that she could refuse consent. Are they required to tell her that she can refuse consent? It's one of the factors. And none of the factors are dispositive. And she was not told a search warrant. She has dyslexia, as is in the record before the court. And she lacks any experience with law enforcement because this is her first felony offense. And so we asked this court to order suppression of the cell phone because the court not only was incorrect in its custody finding, but it failed to address the remaining six factors for the custodial analysis. And I can go through just a few factors that the court got wrong as to custody. The number of officers the district court got wrong. The district court said there were only two officers when in fact three ATF officers were initially there and a fourth officer came once her sister was handcuffed and taken to the ground when she tried to leave. So there were actually four officers present. Is there a magic number, counsel, where too many officers is too okay, but three is not? It's all contextual on the total circumstances. And I think that indicates a heavier police presence there being four officers rather than two. The court found she was not aggressively approached, but the agent testified that he agreed he yelled her name for her to stop. He took her, he says, I'm going to take these. He took all the firearms she had just bought and took them out of her hands. But most importantly, her sister was cuffed and taken to the ground when she tried to leave the parking lot. So if you look at the agent's testimony, he testifies his back was to the car where her sister was. So Ms. Manny was facing her car. So she was being taken to the ground, being put in handcuffs and not being allowed to leave. Was she in a position where she could hear? It was about 150 feet away. So I imagine she could maybe not hear the specifics of what was going on, but certainly know that there was a scuffle going on and another officer arriving quickly in a car to assist with, so her sister wasn't free to leave. I want to go back to where you stated that, you know, the court got it wrong that she was not aggressively approached and there was apparently the officer yelled at her. Give me the context for that. How far was he? Was he yelling as in, hey, get down? Or was he yelling as in, you know, Ms. Manny, I need you to turn around because she's a hundred feet away from him? It's not entirely clear. There's no recording. There's no body cam recording, even though the ATF planned this interdiction, they didn't record the encounter. So it appears she was stopped on the sidewalk directly leaving the firearm store. So I can't imagine that was a very big distance. And she yelled her name. We don't know, right? And we don't know precisely. And I'm sorry, the officer yelled her name? Yes, the officer yelled her name. Okay. And the district court also found she was told two to three times that she was free to leave before he asked for her cell phone. And that, again, is nowhere in the record. The first mention of her being told she's free to leave is when he asks her if she would like to come to the station with him. And that's after he already has her cell phone and after he already has her firearms, the merchandise that she just purchased. So there wasn't also an offer that she could drive herself? There was. Of course, her car was over by her sister who was on the ground in handcuffs. But she did choose to go with the officer. She chose not to drive. And counsel, at any point did she tell the officer, go ahead, you can look through my phone or something to that effect? Later at the ATF station during the second part of the interrogation, but not initially at the outside of the firearms store. And so when is it that the officer actually looked through the phone? The officer, well, there was a question of whether the officer called the phone and then looked at the phone to see if he had called the correct number to identify that as her phone. And he submitted a new report of investigation after his testimony that he did in fact call her phone after he had taken the phone and then checked the phone to see that it was her phone that he had called to identify that. So I think that qualifies as a search. Okay. And when did that happen? Had she already said, you can look at my phone? Or was that prior interrogation? No. That was right after he took the cell phone outside of the firearm, before they went to the ATF station and before that entire interrogation. Okay. So it was only once she was at the station that she, that Ms. Manning said to the officer, you can look at my phone? Yes. And they retained the phone the entire time. And so we asked the court to vacate all counts for man for new trial for jury misconduct and dismiss the case altogether based on Duarte and the government's failure to raise a historical analog. Thank you. Good morning, Your Honors. Thank you, Your Honor. Good morning, Your Honors. And may it please the Court. I'm Nadia Ahmed on behalf of the United States. Your Honors, I'll start where we just left off and really emphasize that the Court, I urge the Court to turn back to the record itself because this is a, these are factual findings that the District Court made. He made them carefully. He had an evidentiary hearing. The things that this Court asked the District Court to do, he did. And when you look at his findings or rather when you look at the evidence that's in the record, it's not quite as it's been represented to you this morning. I'll turn first, Your Honors, to even just how he was approached in that characterization. So if you look at 1176, I'll get that volume number, Your Honors. I want to say 5, but it's ER 1176. So this is the cross-examination of the agent. And it was actually the examiner who inserted the word yelled, that he yelled at Ms. Manning. And he just accepted it. He said yes. And then later, like a few questions later, going on to 1177, that same questioner said, and you called out to her. And the agent again said, yes, I called out to her. And then finally at the bottom of 1177, the questioner said, okay, so you came up behind her and you said her name. And the officer says, yes, that's what I did. And essentially, it's exactly what Your Honor was asking. They're coming out of the store. She was coming out first. He was behind her. He said her name. She turned around, and then they began the engagement. It was in an open parking lot. She was at all times free to leave. The testimony was that he did not block her exit. Initially, there was a TFO officer with him. The officer went away to assist with the sister. Another thing that I encourage you to look at in that is, this man, he is upset. But she's upset. The focus of her upset feelings are entirely about the fact that Mr. Brown, the man that she's in a relationship with, with whom she has children, that he had left her. And so she repeatedly says that during the parking lot. She's upset about that. And then when they get to the ATF office, she elected to ride with Officer Karen there, even though he gave her the option to go in her own car. So clearly that issue with the sister, whatever it was, must have been resolved. But in any event, she decided to go with Officer Karen. When they get to the station, in the interview room, she continues to be upset. But again, her focus is all on the fact that Mr. Brown has left her to deal with this situation. And so I would disagree with any characterization that she, A, there's nothing in the evidence, in the record, to indicate that she saw anything about the sister. In fact, when the officers were asking her a question about her sister, she literally said to them in the record, go ask her yourself. And so it didn't seem that she was in any way really concerned, at least anything from the record, for that to be something that the court should consider. Now, the agent does ask for the cell phone in the parking lot. She does give it to him. He doesn't look, the record is not clear that he looked at it. He called it to confirm that that's the right number, as was his practice. But then they go to the station. So, and Your Honor, I see that the court's thinking about that. I will submit that on the record, he could have heard the ring. It's not clear that he looked at that phone at that time, even in his subsequent report. What happened was that there was an evidentiary hearing on the motion to suppress. He testified. He was pressed about whether or not he had called her. Afterward, he went back and looked at the call logs. And then he submitted a statement because he wanted to bring it back to the court's attention, which the government did. They filed a notice. And then the court again considered it and again found that there was no issue of consent as to the phone. And then, of course, once we get to the station, she repeatedly told the officer, go ahead, look at my phone. Okay. So here's my question. Yes. It's the government's position that Manny consented to the search of her phone, but the agent, or Agent Carson didn't remember calling her phone. He then looks at the call logs, remembers, sends something back to the court and saying, oops, you know, I remembered. I guess my concern is how much can we trust his testimony given his lapse in memory? I mean, what else isn't he remembering? Your Honor, that's a fair, of course, fair question, right? But I think that when you look at the evidence in the whole of the record, his testimony is consistent not only throughout he, himself, is consistent in what he says happened. He very readily said, I don't exactly remember that, when he was on the stand. But his testimony is also consistent with what happens in the interview room, which is recorded. There was a recording. There's video. The court has it. There was a transcript. It's a part of the record. You can see that in that portion, it is also consistent with what he said happened because she repeatedly tells him. It's so spontaneous. They're not really talking about anything to do with the phone, and she keeps saying, you can look at it, you can look at it. And then, actually, there's a point when she also says, you know, you can keep the guns forever long, but then she asks at one point, so am I just never going to get them back? And he explains to her, you know, this is the process. And then she says, okay, so you're going to keep my phone, too. And he said, well, you know, this would be the process. It would be a day if you consent. And then she readily, again, says, I consent. And then she obviously, as the court knows, signs that consent form as well. And it's only after that she signs it that they actually deal with the download or they actually get into the phone. So there's only after that written consent is given and that verbal consent is reaffirmed that they actually inspect the phone. So counsel for Ms. Manny stated that we should toss all of that, partly based on the fact, some of the factors that she gave us. She doesn't believe Miranda was given, not told that she could say no. One of the things she mentioned, I believe, and I don't want to difficulty understanding things that she read. And so I know that we have a signed authorization or a consent. Should we take into account the fact that she may not have been able to understand it? Your Honor, I wouldn't ask the court to completely discount that. It's in the record from her testimony. There's no independent medical expert. But that said, Your Honor, I will say that her, the depth of her understanding is reflected in the entirety of that interview where she's following along. She's very responsive. Even to the extent, I guess, Your Honor, what I would say is that even to the extent there may have been an issue in reading it, she probed and followed up orally and received that and reaffirmed when he asked her. He essentially said, it would be a day if you consent. It couldn't be any clearer. And she said, I consent. So we would submit, Your Honor, that there's no issue with the voluntariness. The district court didn't err in considering all of the factors. He did look at the factors both for the custodial issue and then also for the cell phone. And there was some dovetailing there. And so that's why the record reflects that he's taking. Let me ask this. What is your, you heard counsel talk about the number of officers present when Ms. Manny was contacted. Please respond to that. Your Honor, when she was initially contacted, it was, Agent Karen comes from behind her and he contacts her. The record sounds like very quickly that Stewart or the TFO joins them. So there's two right there. Your Honor, I would submit that whether there's two or four, that's certainly not heavy presence that reconfigured this into a custodial encounter in the parking lot. She was never surrounded by the officers. The other two officers are, again, over with her sister, at least one and then maybe two, and then eventually all three. So for a large portion of their encounter, it's just her and Karen dealing face-to-face with each other. So, Your Honor, we would submit that that factor certainly didn't – the district court did not err in finding that the number of officers was not indicative of a custodial encounter in the parking lot. Is it your understanding that those officers had the recording devices on them? You know, generally they have the cameras or whatnot. They testified, Your Honor. The agent testified, Karen, that at least, you know, he was in plainclothes. He didn't have any kind of recording device. That's – he readily explained essentially that they – he didn't have anything recording on him. He had a cell phone that he guessed he could have, but he was busy engaging with her directly. And then, Your Honor, if the Court is ready, I'd like to just briefly touch on those other items that counsel brought up. First, Your Honor, I would – again, when you look at the record, it's just as to the juror issue. At first blush, it feels uncomfortable, but when you actually look at the record, the juror couldn't have been any clearer that he did not look at issues of caliber. He did not consider the information that he looked at for anything other than for his own personal use. It did not sway him at all in his verdict. And so specifically, Your Honors, I want to talk to you about this question of whether or not the district court got the standard wrong, because it's a little bit confusing when you look at the case law that it says, could it have affected? But then it says that the question, the prosecution, bears the burden ultimately of proving beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. So when you say it's an objective standard, it's not, you know, would a reasonable juror have. It's looking at the accumulation of evidence in this case. Was it so clear or was her guilt so clear that this independent evidence, this extrinsic evidence beyond a reasonable doubt did not impact that verdict? And we submit to Your Honors that it didn't. The record also does reveal that there's a little bit of back and forth with the juror. And at first he says that they looked at it. It sounds like they deliberated for about an hour. But actually, when you look at ER-429, he clarifies when the judge starts to ask him questions that it came up five minutes into deliberations. This is a factor for the court to consider. It came up five minutes into deliberations before the verdict form was signed. Then he, and then there was a suggestion that they deliberated for an hour. And then the juror said, no, verdict was rendered in minutes. And then they ate lunch. And that's all on ER-429. So it is correct that they had their verdict within minutes. And then they spent the rest of that hour, it sounds like, from that juror eating lunch. So, again, we would submit that the only thing, the district court did not get it wrong. The juror did look at two images of a 43 and a 19, Glock 43 and Glock 19. He looked at those images. That's what he said. The district court said he looked at them. The district court found, however, with the overwhelming evidence in the record, that that did not affect the verdict beyond a reasonable doubt that the government had proved that. And that overwhelming evidence, Your Honor, included the WhatsApp communications between Gail Manny and her son. It included also the agent's testimony about the red flags, things like buying numerous of the same kind of gun when your finances don't support it. It included things like her own testimony that even her own children, her daughter at least, seemed to think didn't make sense, that she had bought those guns for a business that had not even materialized at all. So those are some of the overwhelming pieces of evidence, Your Honors, that we would submit demonstrated that this jury knew the verdict. And this particular juror, looking at those two pictures, which is the only thing in the record that, extrinsically, he looked at, that those did not impact that verdict beyond a reasonable doubt. Your Honors, I also want to note that even the size of the guns, whatever they looked like, whatever images he saw, it didn't really matter because he makes clear in his testimony on that motion for new trial hearing that what actually got his attention, because I know that the opening brief really leans into this idea that this was a really important piece of the puzzle for him. But what he said, when you look at his testimony in the stand, was that what was important for him was that you had a text message from the son, or a WhatsApp message, excuse me, saying, find out if they have a clip for a .43. And she had bought guns that were not .43s, period. That was the thing that stood out for him. So you had a receipt, you had the testimony about all the guns she bought, and you had him asking about that. But he also asked about other guns, too. So it was clear that it wasn't just this particular piece of information, it wasn't just this particular comparison of these guns. In fact, looking at their pictures would have had nothing to do in terms of the evidentiary value of that versus what he actually said, the evidentiary value of that WhatsApp message meant to him, which was that here he's asking about something and she hasn't bought any of those things. And so I would submit that that also further supports the District Court's conclusion that, again, beyond a reasonable doubt, the government demonstrated this did not impact the verdict. Your Honor, I'll turn to the issue of Duarte if the Court is ready to move on to that. So, we obviously read it differently. I would submit to the Court that the government's position is not impacted by Duarte. Duarte says that 922 G1 is a problem, but it doesn't talk about 922 A6. Every court, and they're all District Courts that I could find decisions for that have looked at 922 A6, have all come out the opposite way. And it's consistent with Bruin, which is that you start with the plain language of the Second Amendment. Duarte affirms that. When you look at that, if that regulation is not implicated by the plain language of the Second Amendment, then you need not move further in the Bruin analysis. And we would submit, Your Honor, that Duarte affirms what we said in our brief, which is that So the Second Amendment doesn't apply to lying when you purchase a firearm? It doesn't apply to transferring firearms once you receive them? It just relates to possession and self-defense? The focus of the Second Amendment was the right to possess and, as Duarte explains, the right to possess and utilize in self-defense. But, yes, Your Honor, that is what we understand Bruin to say and Duarte to say, that it doesn't reach this regulation regarding how you purchase a firearm. And District Courts that have considered Bruin, obviously they didn't have Duarte, but considered Bruin since its issuance, and 922 A6, have all come out that way, that the Second Amendment is not implicated. And so no further analysis is needed. I would specifically, Your Honor, point to language in the Duarte decision. Your Honor, may I just grab it quickly? Now, Your Honors, I'm looking at the PDF version that's pulled from the Ninth Circuit website. So I'm turning to page 53 of that PDF. And there's a lengthy section that talks about basically the beginning of the paragraph says, the nature of the burden imposed by these laws, talking about laws relating to foreign use of, or possession of foreign firearms by others who were perceived to be arming a foreign, laws relating to arming a foreign enemy. The Duarte decision notes that those are different essentially. Most colonial enactments targeting Indians regulate a different type of conduct. Rather than ban Indians from possessing firearms, the laws prohibited the sale of arms to them by colonial residents. And it goes on to talk about that issue. And I point that out to make the argument, Your Honors, that essentially what I understand them to saying is that 922G isn't about regulating the transfer or the sale. It's focused on that possession piece, which is why it was not satisfied with the government's offering of those laws with respect to finding a historical analog. Your Honor, I would also submit that because Duarte has just come down, even if the court found that Your Honor, what I would say is that no matter what, it seems that Duarte does not impact the lay of the land when it comes to 922A6. And that the court should not find it necessary to go beyond that initial review of the Second Amendment to determine whether or not there's any need to find an analog because, again, it's not implicated by the plain language of the Second Amendment. Unless the court has any further questions for me, I would just ask that the court go ahead, Your Honor. I do have another question. Ms. Manning is objecting also to the district court's sentence imposed by the district court, the way that the conditions of the district court incorporate a reference to the PSR, and the PSR references the sentencing guidelines, and specifically where it lays out the 13 special conditions or standard conditions. Were those attached to the PSR, physically attached, or is it... It's just a reference, Your Honor. And so I recognize that that might not be sufficient for this court's purposes in terms of making sure that Ms. Manning had an accurate indication that the paper was handed in open court, but it doesn't... The court first says, I'm going to impose the standard conditions, and then says, I'm also going to impose the special conditions. Do you acknowledge that you received the paper that's handed to you in open court? Unfortunately, that's also not attached to anything. So with those two pieces, Your Honor, I recognize that there may be some deficiency. And so if the court felt uncomfortable with the record as it is now, we would agree that a limited remand, just for the purposes of discussing those 13 standard conditions, would be appropriate. Thank you. Thank you, Your Honor. Thank you, Your Honor. Just addressing the last question first with Montoya. The PSR was referenced, but it wasn't actually incorporated into the court's final rulings as to conditions. And as government pointed out, the PSR did not actually list the conditions. And so we would ask that this court does what it does in many cases and remand to clarify those, which is important because Ms. Manning is now on supervised release. So she needs to know what conditions apply. And moving to Duarte and Bruin, it appears the government's arguing that Bruin doesn't apply in any matter as to sales or purchasing of firearms, which I think is not the case with Bruin. In Duarte, at page 7, they say Bruin expressly requires court to assess whether any, and they stress any, regulation infringing on Second Amendment rights is consistent with this nation's historical tradition. And so that's a very broad statement. And the ASIC statute does fall under the chapter referring to firearms. It is specifically a crime only in connection with the purchase of a firearm. And so we argue that that does fall under the Second Amendment, and the government has waived any argument as to the historical analog in this case, warranting dismissal on that ground. And to go to the encounter outside of the firearms store, again, I think we have to look at the history of firearms. And I think what's most important is that we don't have a recording. Even though this was planned that these three officers would come, and they would, he described it as an interdiction where they would confront her with evidence, and it could become this contentious interrogation, that they did not record the encounter, even though they did have cell phones that could have recorded the encounter. There were facts about the encounter wrong, that there were only two officers, when all along the testimony was that these three officers were coming to interdict her, and then a fourth officer arrived. And that's just one example of the errors that the district court made based on the record here. I'd like some clarification. Earlier, counsel for the government mentioned, when I asked about how quickly the decision was made, or the verdict was reached by the jury, we were told five minutes, and then they had lunch. So you mentioned, yeah, they said five minutes, but they were there for an hour. Well, they were there for an hour before the verdict was returned to the court. And there was a lunch. There was a lunch that the jury had. And that juror did testify that they talked about it in the first five minutes, or they reached their verdict quickly and then had lunch? I believe he said they did reach their verdict rather quickly. I don't know that we have, that we know whether they continued to discuss the case during lunch or any of that, because he was the only juror that was examined. No other juror was examined, which is a big difference between this and other cases. Typically, more of the jury is interviewed. But what's important is that the district court couldn't ask, did this affect his verdict? Did he say this affected his verdict? That is a question that's prohibited. And what the court has to do is, could this reasonably have affected the verdict for anyone? And, again, it was brought up to the entire jury that these were supposedly different-sized guns, meaning they weren't interchangeable, when, in fact, that was not the case. And, again, there was no testimony on this point, even though the district court found that there was. There is no testimony as to the differences between Glock 43 or Glock 19 or the lack thereof. And unless there are further questions from the court, we'll ask this court to dismiss or vacate for new trial. Thank you very much. Okay. This case is now submitted, and that concludes our argument for this morning. The court will stand in recess.
judges: DESAI, ALBA, Gutierrez